UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES for the use and benefit of BFF WATERPROOFING LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 13-CV-0440-CVE-FHM |
| THE ROSS GROUP CONSTRUCTION CORP., and FEDERAL INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) | |

# OPINION AND ORDER

Now before the Court are Plaintiff's Motion for Partial Summary Judgment and Brief in Support (Dkt. # 29), Defendants The Ross Group Construction Corp. and Federal Insurance Co.'s Motion for Partial Summary Judgment and Brief in Support (Dkt. # 30), Defendants' Combined Motion to Strike Portions of Plaintiff's Motion for Partial Summary Judgment (Dkt. # 41), and Plaintiff's Motion for Leave to File Amended Motion for Partial Summary Judgment (Dkt. # 47). Plaintiff United States for the use and benefit of BFF Waterproofing LLC (BFF)[1] argues that the plans and specifications of the subcontract entered into by BFF and The Ross Group Construction Corp. (Ross) are defective, uncertain, or ambiguous. Dkt. # 29. Defendants argue that BFF is not entitled to additional compensation for sealing existing joints that exceed five-eighths of an inch in width or for media blasting existing joints. Dkt. # 30.

---

[1] BFF shall refer to both BFF Waterproofing LLC and the United States for the use and benefit of BFF Waterproofing LLC.

# I.

On August 5, 2011, "the Federal Government, by and through the Naval Facilities Engineering Command Southeast, IPT Gulfcoast [NAVFAC], issued [Ross] a delivery order/call [Task Order] against [Ross's] existing contract with NAVFAC. The Task Order called for construction of certain improvements on [a project]." Dkt. # 29-2; Dkt. # 29-12; Dkt. # 40-2, at 2. The project is known as the Goliad T-6 Operational Facility Project. Dkt. # 29-8, at 1. The work encompassing the project took place in Goliad, Texas, and involved the rehabilitation of runways. Dkt. # 29-12; Dkt. # 30-2.

Ross "issued Subcontract Agreement 02903.10.321373.01 to BFF on December 7, 2011 . . . in the amount of $479,330.00." Dkt. # 30, at 2; see also Dkt. # 43, at 2. The parties agreed to certain amendments, and the amendments were handwritten into the subcontract. Dkt. # 30, at 2; Dkt. # 43, at 2.[2] The work performed by BFF is referred to, generally, as waterproofing. Dkt. # 29-1, at 2. Article II of the subcontract and Exhibit No. 5 to the subcontract set forth BFF's scope of work. Dkt. # 30, at 2; Dkt. # 43, at 2. The scope of work included "Demo, clean, herbicide, prep, and install new sealant for concrete paving joints," "Demo, clean, herbicide, prep, and install new sealant for concrete to asphalt joints," "Demo all existing joint sealant," "Clean, herbicide, prep, and install joint sealant where required," "Caulking of expansion joints on flat work only," and "Seal all existing joints as need. [sic] on flat work only." Dkt. # 30-1, at 17; see also Dkt. # 30, at 2-3; Dkt. # 43, at 2. "The majority of the joint sealant work on the runways involved existing joints rather than new pavement." Dkt. # 29, at 6; see also Dkt. # 40, at 3.

---

[2]  Neither defendants nor BFF have provided the Court with a complete copy of the subcontract agreement. Consequently, the Court will consider only the portions of the subcontract that are within the partial summary judgment record.

Included among the specifications for field molded sealants for sealing joints in rigid pavements were instructions on the refacing of joints. Dkt. # 29-10, at 5. The instructions state that a concrete saw should be used to "remove all residual old sealant and a minimum of concrete from the joint face to provide exposure of newly cleaned concrete, and, if required, to enlarge the joint opening to the width and depth shown on the drawings." Id.

"The plans and specifications, in short, the 'work details' for the entire Project, including BFF's scope of work, were prepared by the engineering firm, Garver, LLC [Garver]." Dkt. # 30, at 3; see also Dkt. # 43, at 2. The project "was a design-build project as to [Ross] and [Ross] was responsible for the plans and specifications." Dkt. # 29, at 5; see also Dkt. # 40, at 3. Garver was hired as the designer by Ross. Dkt. # 29, at 5; Dkt. # 40, at 3. BFF's bid was made pursuant to the plans and specifications provided by Ross. Dkt. # 30, at 4; Dkt. # 43, at 3. The subcontract states that BFF will complete the entire scope of its work for $479,330. Dkt. # 30, at 4; Dkt. # 43, at 3.

On July 18, 2012, Ross notified BFF that it would investigate BFF's claim that it was entitled to additional compensation for costs incurred sealing existing joints. Dkt. # 30, at 4; Dkt. # 43, at 3. Ross also stated that, in any case, BFF was required by the subcontract to complete all joint sealant work. Dkt. # 30, at 4; Dkt. # 43, at 3. George Bridges, president and one of the owners of BFF, agreed that BFF would complete all the joint sealant work. Dkt. # 30-7, at 1; Dkt. # 43-10, at 1.

The project's plans and specifications "required BFF to follow all manufacturer recommendations insofar as product application is concerned." Dkt. # 30, at 4; see also Dkt. # 43, at 4. "In performing its scope of work BFF (and BFF alone) elected to use Pecora 300 SL, a self-leveling joint sealant." Dkt. # 30, at 5; see also Dkt. # 43, at 4. "Ultimately, Pecora, the

3

manufacturer of the joint sealant BFF chose to use, determined and recommended that BFF 'media blast' the existing joints so the sealant could adhere to sides of those existing joints." Dkt. # 30, at 5 ; see also Dkt. # 43, at 4. Pecora recommends media blasting "as a method of preparing the sides or surfaces of the existing joints before installing joint sealant." Dkt. # 30, at 5; see also Dkt. # 43, at 4.

Two sheets of the project plans are of particular interest: C-121 and C-122. See Dkt. # 30-2, at 1 (describing C-121 and C-122 as sheets of the project plans). Sheet C-122 is entitled "PCC[3] JOINT DETAILS I." Dkt. # 30-4 (footnote added). It diagrams five types of joints: "DOWELED CONSTRUCTION JOINT AT EXISTING/PROVIDED PAVEMENT," "DOWELED CONSTRUCTION JOINT", "DOWELED CONTRACTION JOINT," "HINGED CONTRACTION JOINT," and "DUMMY CONTRACTION JOINT." Id. A portion of each joint is magnified in an inset. Id. The inset contains three magnifications: one for expansion joints, one for contraction joints, and one for construction joints. Id. However, it appears that none of the diagramed joints references the expansion joint magnification. Id. It is unclear from the materials provided whether that magnification is superfluous or whether it is referenced by diagrams on a different sheet or otherwise incorporated elsewhere. Id. Each of the magnifications refers to a variable, "W," three times. Id. Each magnification uses the variable "W" to identify the width of a gap that is to be filled with sealant.[4] Id. The width is identified as "W, SEE TABLE." Id. The table lists the minimum and maximum widths for two joint spacings: twenty feet and twenty feet (NAVY). Id. For a joint spacing of twenty feet, the maximum width is listed as one-half inch, and the minimum width is

---

[3]   PCC stands for Portland cement concrete. Dkt. # 40, at 3; see also Dkt. # 29-10, at 1.

[4]   It appears that these gaps are the width of the joint.

4

listed (illogically) as five-eighths of an inch. Id. For a joint spacing of twenty feet (NAVY), the maximum width is listed as three-eighths of an inch and no minimum width is listed. Id. The expansion joint magnification also displays the phrase "3/4" MIN." directly below "W, SEE TABLE." Id. It is unclear if that phrase is referring to "W," as that specification would further clash with the already inexplicable table.

Sheet C-121 is entitled "REHABILITATION DETAILS." Dkt. # 30-3. It contains three diagrams: "SPALL REPAIR AT WEAKENED PLANE OR CONTRACTION JOINT," "SPALL REPAIR AT EXPANSION JOINT," and "JOINT REPAIR DETAIL."[5] Id. The two spall repair diagrams use the variable "W" to represent the distance between the joint sealant and the sawcut. Id. The diagrams make clear that a portion of the width denoted by variable "W" must be at least "2 IN. (50mm) MINIMUM" and, consequently, that "W" must be at least that large as well.[6] The joint repair detail refers to the variable "W" three times. Id. It uses the variable "W" to represent the width of the gap that will be filled with sealant.[7] Id. It does not reference any table for further identification of "W." Id.

Kelly S. Fincannon, P.E., is employed by Garver. Dkt. # 30-2, at 1. Fincannon was the designer of record for sheets C-121 and C-122. Id. Fincannon states that sheet C-121 provides the work details for the rehabilitation of existing joints. Id. Fincannon states that the joint repair detail

---

[5] The joint repair details diagram is also labeled "D5." Dkt. # 30-3. That identifier also designates the expansion joint magnification on sheet C-122. Dkt. # 30-4. This is merely a coincidence, the alphanumeric identifiers on C-121 and C-122 are simply a function of a diagram's placement on the x- and y-axes of the sheets. Dkt. # 30-3; Dkt. # 30-4.

[6] The Court interprets this use of the variable "W" to be completely independent from any other use of the variable "W."

[7] Again, it appears that this gap is the width of the joint.

of sheet C-121 "contains neither a predetermined width for the existing joints, those to be 'rehabilitated,' nor a minimum / maximum range within which the width of those existing joints might fall." Id. Fincannon states that the width is instead denominated by the variable "W." Id. at 2. Fincannon further states that sheet C-122 shows the "work details for new (not pre-existing) joints" and that "[t]he work details on Sheet C-122 do not speak to or otherwise related, in any way, to the work to be performed on the existing joints; that . . . is shown on Sheet C-121." Id.

Benjamin Barnes, the Ross project manager for the runway portion of the project, agrees that sheet C-122 does not provide details about the width of the gap in existing joints that will be filled with sealant. See Dkt. # 29-4, at 5-6; Dkt. # 57-2, at 6. He states that sheet C-121 provides that the width is unspecified and represented by the variable "W." Dkt. # 29-4, at 5. He further states that sheet C-122 must pertain to new concrete because it "is based on construction with dowels and you cannot place a dowel in concrete that is already in place. The dowel bars are associated with new concrete." Id. at 6. Barnes also states that the width of a joint can be determined by a thorough site visit, although determining the width may require removing some of the existing joint sealant that has leaked out. Id. at 7-9. He states that he informed Bridges that on some portions of the runway grass was growing through the joints, preventing a visual identification of their size. Dkt. # 40-5, at 3. Additionally, joint sealant had spilled out of the existing joints onto the runway. Id. at 7. He also states that he informed BFF's Bridges that Bridges needed to "inspect everything before he bids this." Id. at 3-4. He states that Bridges declined his invitation to view the entire runway and that Bridges "obviously didn't allow himself enough time to look at the job site thoroughly." Id. at 4.

Bridges states that the project "was bid by BFF based on material required for joints with a maximum size of 5/8ths [of an inch]." On September 9, 2011, Bridges stated that he had not visited

6

the site of the project, but had seen photos on Ross' website and had sent a friend to visit it. Dkt. # 30-5, at 1. However, he ultimately visited the site twice. Dkt. # 29-8, at 1; Dkt. # 57-2, at 11. Bridges states that no destructive testing was permitted at the site. Dkt. # 29-8, at 1. He further states that "[t]he actual size of the existing joints was obscured by old joint sealant material which covered the joints on the existing runways." Id. at 2. He states that some joints "were larger in width than 5/8ths [of an inch]. Some of the joints were 2.5 to 4 inches wide." Id. Bridges also states that sheet C-122 does not only pertain to new joints, as the diagram labeled A3 has no dowel rods. Dkt. # 43-3, at 3-4. Additionally, he states that sheet C-121 does not "speak to or govern the repair of existing joints." Id. at 4.

Tony Scorsone is a certified professional constructor, retained by BFF to provide a professional evaluation related to the BFF bid proposal. Dkt. # 29-11, at 1. Scorsone opines that the "3/4" MIN." on sheet C-122 means that the joint width is a minimum of three-quarters of an inch, which he notes conflicts with the table's already nonsensical dimensions of one-half of an inch maximum and five-eighths of an inch minimum. Id. at 2. Scorsone also opines that a visual inspection would not have been able to identify the existing joint width. Id. Scorsone further opines that, because of the ambiguity of the details, "the worst case scenario would have been to calculate all joint repairs at a width of 3/4"." Id. Additionally, Scorsone opines that "it would be common practice to use the only available information given, which would have been the details and the joint table shown on sheet C122. This information would have [been] the basis of preparing the estimate to calculate the amount of joint sealant required for the project." Id. Scorsone opines that:

> Unless there are other documents that clearly state that the bidding contractor is required to verify existing joints and/or that it is the responsibility of the bidding contractor to assume responsibility for the existing site conditions and have this accounted for in his bid, it would not be the responsibility of the bidding contractor

7

to make the determination of the size of the existing joints but rather his responsibility would lie in using the details provided in the construction documents.

Id. Scorsone opines that there "is no mention in the plans of existing conditions or required verification of the existing joints to confirm the width depth [sic] etc." Id.

BFF filed its complaint on July 19, 2013, Dkt. # 2, alleging that Ross breached its contract with BFF by failing to pay the outstanding balance for the work performed by BFF, that Ross breached its contract with BFF and was unjustly enriched due to its failure to compensate BFF for additional work that was neither anticipated, nor included, in the projects plans and specifications, and that Federal Insurance Company "has failed to fulfill its obligation" under a payment bond it had issued to Ross. Id. at 2-6.

Both BFF and defendants have filed motions for partial summary judgment. Dkt. ## 29, 30.[8] Defendants have responded (Dkt. # 40) to BFF's motion, and BFF has replied (Dkt. # 57) to that response. BFF has responded (Dkt. # 43) to defendants' motion, and defendants have replied (Dkt. # 56) to that response.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[8] Defendants have filed Defendants' Combined Motion to Strike Portions of Plaintiffs' Motion for Partial Summary Judgment (Dkt. # 41). They argue that BFF's motion for partial summary judgment technically violates Fed. R. Civ. P. 56 and LcvR 7.2 and 56.1. Defendants' motion is denied. However, as required by Fed. R. Civ. P. 56, the Court will consider only the undisputed facts when determining whether BFF is entitled to judgment as a matter of law. In response to defendants' motion, BFF has filed a motion for leave to file an amended motion for partial summary judgment, in order to address the deficiencies alleged by defendants. Dkt. # 47. As defendants' motion has been denied, BFF's motion is moot.

8

242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

**A. Defendants' Motion for Partial Summary Judgment**

Defendants argue in their motion for partial summary judgment that BFF is not entitled to additional compensation for sealing joints with widths in excess of five-eighths of an inch or for media blasting existing joints. Dkt. # 30, at 7.[9]

**1. Joints Exceeding Five-eighths of an Inch**

BFF is seeking additional compensation for sealing existing joints that were wider than five-eighths of an inch. Dkt. # 2, at 3. Defendants argue that BFF is not entitled to additional payment for sealing those joints because the terms of the subcontract provided that BFF would seal "all" of the existing joints. Dkt. # 30, at 8. Defendants are correct that the subcontract specified that BFF was to "seal all existing joints." Dkt. # 30-1, at 17. However, under Oklahoma law, a contractor is "entitled to rely on the plans and specifications prepared by [the contracting party] and to thereafter recover its damages and losses incurred as a result of the inadequacy of same." Miller v. City of Broken Arrow, Okla., 660 F.2d 450, 457 (10th Cir. 1981); see also Woods v. Amulco Prods.,

---

[9] Defendants' prayer for relief requests summary judgment on BFF's first and third breach of contract claims. Dkt. # 30, at 11. BFF's complaint does not have a third breach of contract claim and its first breach of contract claim is for damages owed under the subcontract and not for additional compensation. See Dkt. # 2. The Court assumes defendants are seeking summary judgment on BFF's claims for additional compensation, whether via breach of contract or unjust enrichment.

Inc., 235 P.2d 273, 276 (Okla. 1951).[10] Therefore, in formulating its bid for the subcontract, BFF was entitled to rely on the plans and specifications provided by Ross.

Defendants argue that the plans and specifications of the subcontract provide that the width of the existing joints that BFF was required to fill with sealant was defined by the variable "W," and that the variable "W" was undefined and could represent any width. Dkt. # 30, at 8. BFF argues that the variable "W" is defined by the subcontract to have a maximum width of five-eighths of an inch. Dkt. # 43 at 9-11. The question of whether the subcontract defines the variable "W" is a matter of contract interpretation.

"The interpretation of a contract, and whether it is ambiguous is a matter of law for the Court to determine and resolve." K & K Food Servs., Inc. v. S & H, Inc., 3 P.3d 705, 708 (Okla. 2000). "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Okla. Stat. tit. 15, § 152. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Id. § 154. "When a contract is reduced to writing, the intention of

---

[10] The Oklahoma cases cited by defendants, Bearden v. Smith, 274 P.2d 1015 (Okla. 1954), and Cook v. Okla. Bd. of Pub. Affairs, 736 P.2d 140 (Okla. 1987), are distinguishable. In Bearden, the plaintiff attempted to collect additional compensation for the work he had been contracted to do because an employee of the defendant had induced him to perform the work in an inopportune manner. 274 P.2d at 1017. Here, BFF does not allege that it was induced into performing its duties in an inopportune manner; rather, it is alleging that the plans and specifications of the subcontract it bid on were defective, resulting in it being forced to expend more time and materials in fulfilling its duties than it anticipated. Bearden is inapplicable. Cook is even less helpful to defendants. It held that a plaintiff can recover on a claim for misrepresentation in a public construction contract--which is not even the claim alleged by BFF--if "the underlying data actually provided to the bidder was inaccurate." Cook, 736 P.2d at 148. BFF is, in fact, alleging just that, by claiming the data on the width of existing joints was inaccurate.

the parties is to be ascertained from the writing alone, if possible." Id. § 155. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." Id. § 157. "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Id. § 160. "A contract term is ambiguous only if it can be interpreted as having two different meanings." K & K Food Servs., 3 P.3d at 708. "'In cases of uncertainty . . . the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'" Amundsen v. Wright, 240 P.3d 16, 20 (Okla. Civ. App. 2010) (quoting Okla. Stat. tit. 15, § 170) (alteration in original).

Defendants assert that sheet C-121 contains all rehabilitation details, that sheet C-121 denotes the width of the existing joints that are to be filled with sealant with the variable "W," and that "W" is intentionally indefinite on sheet C-121. Dkt. # 30, at 8. They argue, relying on Fincannon's affidavit, that sheet C-122 relates only to new joints and not existing joints, and that the limitations of the variable "W" on sheet C-122 are inapplicable to the variable "W" on sheet C-121. Dkt. # 40, at 3. They conclude that the subcontract clearly intends for the width of existing

12

joints to be indefinite and, consequently, that BFF was required to seal all the existing joints, regardless of their width. Dkt. # 30, at 8-9.[11]

Defendants' arguments are unpersuasive. The maximum width of the existing joints, as denoted by the variable "W," is uncertain and ambiguous. Defendant is correct that the variable "W" is undefined on sheet C-121. Dkt. # 30-3. Defendant is also correct that sheet C-121 provides rehabilitation details.[12] However, the whole of a contract is to be interpreted together. Okla. Stat. tit. 15, § 157. Sheet C-122 provides a maximum width for expansion, contraction, and construction joints. Dkt. # 30-4. While defendants argue that sheet C-122 applies only to new joints, sheet C-122 does not state that the joint magnifications apply only new joints; the sheet is entitled only "PCC JOINT DETAILS I," not "NEW PCC JOINT DETAILS I." Id. It is also reasonable to conclude that the joint magnifications can apply to other portions of the plans and specifications. While two of the magnifications on sheet C-122 are referred to elsewhere on the sheet, one of the magnifications

---

[11] Defendants also argue that BFF should have more thoroughly inspected the runway to determine the width of the joints prior to bidding. Dkt. # 30, at 8-9. However, due to overgrown grass and sealant leakage, a visual inspection would not disclose the width of the existing joints. Dkt. # 43-1, at 5-7; Dkt. # 40-5, at 3, 7. One of Ross' employees has suggested that BFF should have removed the leaked sealant in order to better determine the actual width of the joints. See Dkt. # 43-1, at 6-7. It is unreasonable to suggest that each bidding subcontractor should have been required to travel to the site, remove leaked sealant--a portion of the work required by the subcontract itself--, and inspect a large enough sample of joints to determine the maximum width of the existing joints. Additionally, there is a question as to whether destructive testing was even permitted. See Dkt. # 29-8, at 1. In any case, BFF was entitled to rely on the plans and specifications of the subcontract.

[12] BFF argues that sheet C-121 applies only to joint repair that arises as a consequence of spall repair and not to the replacement of sealant in joints that are not involved in spall repair. Dkt. # 43, at 7-8. There is nothing on sheet C-121 that suggests that the joint repair detail on the sheet is so limited.

is not. Dkt. # 30-4. Presumably, that magnification is used elsewhere in the specifications; otherwise, its inclusion in the plans would be superfluous.[13]

Also weighing against defendants' position, is the fact that another portion of the subcontract contemplates a definite width for the existing joints. Every part of a contract is to be given effect, if reasonably practicable. Okla. Stat. tit. 15, § 157. The plans and specifications for refacing existing joints state that a concrete saw is to be used to "remove all residual old sealant and a minimum of concrete from the joint face to provide exposure of newly cleaned concrete, and if required, to enlarge the joint opening **to the width and depth shown on the drawing**." Dkt. # 29-10, at 5 (emphasis added). Interpreting the width of existing joints to be completely indefinite renders this specification meaningless; every joint already falls within width shown on the drawing if the width is indefinite.

The maximum width of the existing joints provided in the contract can be interpreted in two ways: either "W" is indefinite, or it is limited to the maximum width described on sheet C-122. The Court finds as a matter of law that the contract is uncertain and, thus, ambiguous as to this specification. Therefore, the language of the contract should be interpreted "most strongly" against Ross, as the party who caused the uncertainty. See Okla. Stat. tit. 15, § 170; Amundsen, 240 P.3d at 20. Therefore, the maximum width of the existing joints is to be defined by sheet C-122. However, there is also considerable ambiguity as to the maximum width provided by sheet C-122. As stated supra, sheet C-122 illogically describes the maximum width of the joints as one-half of an inch, while describing the minimum width as five-eighths of an inch, resulting in the minimum

---

[13]  The inclusion of a joint magnification unrelated to the doweled joints featured on sheet C-122 also disposes of defendants' argument that sheet C-122 must pertain only to new joints because it deals only with joints containing dowels, which must necessarily be new joints.

width exceeding the maximum width. Dkt. # 30-4. Additionally, sheet C-122 also seems to suggest that the minimum width of expansion joints is three-quarters of an inch, a width larger than both the previously described minimum and maximum of one-half and five-eighths of an inch. Id. Again, this ambiguity must be interpreted "most strongly" against Ross, as the party who caused the uncertainty. See Okla. Stat. tit. 15, § 170; Amundsen, 240 P.3d at 20. The maximum width of the existing joints is interpreted to be five-eighths of an inch. BFF was entitled to rely on this specification and to recover its damages and losses incurred as a result of this inaccuracy. Miller, 660 F.2d at 457; see also Woods, 235 P.2d at 276. Defendants' motion for partial summary judgment should be denied to the extent that they argue that the variable "W" is indefinite and that BFF is not entitled to additional compensation for sealing existing joints with widths exceeding five-eighths of an inch.

**2. Media Blasting**

BFF is seeking additional compensation for media blasting joints. Dkt. # 2, at 4. Defendants argue that BFF is not entitled to additional compensation, because media blasting was recommended by the manufacturer of the joint sealant that BFF chose to use, and the plans and specifications provided that BFF was required to follow all manufacturer recommendations relating to product application. Dkt. # 30, at 9-11. BFF argues that, because it was unforseen that media blasting would be required, it is entitled to additional compensation. Dkt. # 43, at 14-15.

In performing its joint sealing work, BFF chose to use Pecora 300 SL sealant. Dkt. # 30, at 5; Dkt. # 43, at 4. Pecora, the manufacturer of Pecora 300 SL, recommended that BFF media blast the existing joints so that the sealant would better adhere to the joints. Dkt. # 30, at 5; Dkt. # 43, at 4. The project's plans and specifications "required BFF to follow all manufacturer

15

recommendations insofar as product application is concerned." Dkt. # 30, at 4; see also Dkt. # 43, at 4. Therefore, the media blasting was contemplated by the project's plans and specifications, and BFF is not entitled to additional compensation for the media blasting. Defendants' motion for partial summary judgment should be granted only to the extent that they argue that BFF's claim for additional compensation for media blasting should be denied.

**B. BFF's Motion for Partial Summary Judgment**

BFF argues in its motion for partial summary judgment that the plans and specifications for the project are defective, in that they provide that the maximum width of existing joints is five-eighths of an inch, even though the existing joints were, in places, much larger. Dkt. # 29, at 9. Alternatively, BFF argues that the contract is ambiguous and, therefore, should be construed against Ross. Id. at 13. BFF requests partial summary judgment finding that "the plans and specifications on the Project are insufficient and defective or ambiguous and must be construed against [Ross] as a matter of law." Id. at 14.[14]

As discussed supra, the plans and specifications are, at best, so uncertain as to be ambiguous as to the maximum width of the existing joints and must be construed against Ross. BFF was entitled to rely on the plans and specifications for the proposition that the existing joints would be no wider than five-eighths of an inch. BFF's motion for partial summary judgment should be granted.

---

[14]    BFF provides additional information about its claims and the bases therefor in a section of its motion entitled "Factual Background." Dkt. # 29, at 1-5. However, it is clear that BFF is not requesting summary judgment on the claims themselves, but rather just on the more limited question of whether the plans and specifications of the subcontract provided an upper limit on the width of the existing joints. See generally id.

**IT IS THEREFORE ORDERED** that Defendants' Combined Motion to Strike Portions of Plaintiff's Motion for Partial Summary Judgment (Dkt. # 41) is **denied**, and Plaintiff's Motion for Leave to File Amended Motion for Partial Summary Judgment (Dkt. # 47) is **moot**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment and Brief in Support (Dkt. # 29) is **granted**.

**IT IS FURTHER ORDERED** that Defendants The Ross Group Construction Corp. and Federal Insurance Co.'s Motion for Partial Summary Judgment and Brief in Support (Dkt. # 30) is **granted in part and denied in part**: it is granted to the extent that they request that BFF's claim for additional compensation for media blasting be denied; it is denied in all other respects.

**DATED** this 9th day of July, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE